**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CACHIL DEHE BAND OF WINTUN
INDIANS OF THE COLUSA INDIAN
COMMUNITY, a federally recognized
Indian Tribe,
          *Plaintiff-Appellant,*

    v.

STATE OF CALIFORNIA; CALIFORNIA
GAMBLING CONTROL COMMISSION,
an agency of the State of
California; and ARNOLD
SCHWARZENEGGER, Governor of the
State of California,
          *Defendants-Appellees.*

No. 06-16145

D.C. No.
CV-04-02265-FCD

ORDER
AMENDING
OPINION AND
DENYING THE
PETITION FOR
PANEL
REHEARING AND
PETITION FOR
REHEARING
EN BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
April 9, 2008—Pasadena, California

Filed August 8, 2008
Amended October 24, 2008

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Canby

14913

## COUNSEL

George Forman, Forman & Associates, San Rafael, California, for the plaintiff-appellant.

Christine M. Murphy, Deputy Attorney General, Sacramento, California (briefs); Peter H. Kaufman, Deputy Attorney General, San Diego, California (oral argument); for the defendants-appellees.

## ORDER

The opinion filed in this case on August 8, 2008, slip op. at 10159, to appear at 536 F.3d 1034 (9th Cir. 2008), is amended as follows:

At slip op. at 10166, first full paragraph, line 6: Insert "by the tribe on September 1, 1999," after "number of gaming devices operated."

At slip op. at 10169, lines 3-4: delete "for the issuance of up to 22,500 additional gaming device licenses" and substitute therefor: "for the operation of up to 22,500 additional gaming devices."

At slip op. 10174, lines 11-12: delete "for the issuance of up to 22,500 additional licenses" and substitute therefor: "for the operation of up to 22,500 additional gaming devices."

With these amendments, the panel has voted to deny the petition for panel rehearing. Judges Kleinfeld and Bybee have

voted to deny the petition for rehearing en banc, and Judge Canby has so recommended.

The petition for en banc rehearing, together with these amendments, has been circulated to the full court, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(b).

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed. No other petitions for panel or en banc rehearing remain pending.

## OPINION

CANBY, Circuit Judge:

This appeal concerns the joinder requirements of Rule 19 of the Federal Rules of Civil Procedure and their effect on litigation brought by an Indian tribe engaged in casino gaming. The Cachil Dehe Band of Wintun Indians of the Colusa Indian Community ("Colusa"), a federally recognized Indian tribe, entered into a gaming compact with the State of California in 1999. Colusa brought this action for declaratory and injunctive relief against the State, its Governor and the California Gambling Control Commission (collectively, "the State"). Colusa challenges the Commission's interpretation of the compact and the Commission's assumption of authority to administer unilaterally the licensing of electronic gaming devices. The district court concluded that the many other Indian tribes that had entered into identical gaming compacts with the State in 1999, as well as California's non-gaming tribes, were required parties to this action. Because Indian tribes enjoy sovereign immunity and the action could not proceed in their absence, the district court granted the State's motion for judgment on the pleadings. Colusa appeals.

Because we conclude that the absent tribes are not required parties to this action, we reverse the district court's judgment (with one minor exception) and remand for further proceedings.

## BACKGROUND

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA") "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA recognizes three classes of gaming. 25 U.S.C. § 2703(6)-(8). Slot machines and equivalent gaming devices, which are the exclusive subject of this litigation, are Class III games. *See* 25 U.S.C. § 2703(7)(B)(ii), (8). Under the statute, a tribe may conduct Class III gaming activities only "in conformance with a Tribal-State compact entered into by the Indian tribe." 25 U.S.C. § 2710(d)(1)(C).

In September 1999, Colusa entered into a gaming compact (the "Compact") with the State of California, which sets forth various provisions relating to the operation of Class III gaming devices. *See* Tribal-State Gaming Compact Between the Colusa Indian Community and the State of California (Oct. 8, 1999). At the same time, sixty-two other tribes (the "Compact Tribes") executed virtually identical bilateral compacts with the State (the "1999 Compacts").[1] *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 717-18 (9th Cir. 2003). The 1999 Compacts limit the number of gaming devices operated by each tribe to 2,000. *See* 1999 Compacts, § 4.3.2.2(a). They also establish a formula setting a statewide maximum number of gaming devices that all Compact Tribes may license in the aggregate under the 1999 Compacts. *Id.* § 4.3.2.2(a)(1).

---

[1]A generic copy of a 1999 Compact is available at http://www.cgcc.ca.gov/enabling/tsc.pdf (last visited July 31, 2008).

A Compact Tribe, however, is not free to choose unilaterally how many gaming devices to operate, even if it wishes to operate fewer devices than the 2,000 limit. The Compacts establish a threshold number of devices that tribes may operate without a license. *Id.* § 4.3.1. In Colusa's case, that number was set at the number of gaming devices, 523, operated by the Tribe on September 1, 1999. For each additional gaming device, Colusa is required to obtain a license. *Id.* § 4.3.2.2(a). These licenses are distributed among the Compact Tribes who apply to obtain them pursuant to a detailed draw process. *See id.* § 4.3.2.2(a)(3). Under this process, a Compact Tribe's likelihood of being awarded a license hinges on its placement in one of five priority tiers. *Id.* Placement in a particular tier depends in part—though not exclusively— upon the number of gaming devices already operated by the tribe; the fewer gaming devices a tribe operates, the higher its priority tier. *Id.* If, in any given round, more licenses are requested in aggregate by the Compact Tribes than the Commission is distributing, the license draw process is structured to award the bulk of those licenses to the Compact Tribes who have not yet developed large gaming operations. *Id.*

In 2001, then-Governor Gray Davis issued an executive order requiring the California Gambling Control Commission ("Commission") to take control of the licensing of gaming devices. Exec. Order No. D-29-01 (Mar. 8, 2001). Previously, a tribal administrator had conducted gaming device license draws. As soon as the Commission assumed control, it declared the licenses issued in previous draws invalid and replaced them with licenses issued by the Commission.

The 1999 Compacts also envision a revenue-sharing mechanism for the benefit of California's non-gaming tribes. *See* 1999 Compacts, § 4.3.2.1. In order to acquire licenses for gaming devices in excess of their initial allowance, Compact Tribes must pay "a non-refundable one-time pre-payment fee" of $1,250 for each gaming device being licensed. *Id.* § 4.3.2.2(e). In addition, in order to keep their licenses cur-

rent, Compact Tribes must pay annual fees for each licensed device in accordance with a pre-determined fee schedule. *Id.* § 4.3.2.2(a)(2). The fees are to be deposited in the Revenue Sharing Trust Fund ("Revenue Fund"), a fund created by the California State Legislature and administered by the Commission as trustee. *Id.* Each Non-Compact Tribe[2] is entitled to receive a distribution of $1.1 million per year from the Revenue Fund, unless the funds therein are insufficient, in which case the available funds are distributed in equal shares among the Non-Compact Tribes. *Id.* § 4.3.2.1(a). The Commission has interpreted the 1999 Compacts as providing that the non-refundable, one-time pre-payment fee may be used as a credit toward annual license fees, and that no annual fees would be required for the first 350 licenses issued to a tribe.

Pursuant to the 1999 Compacts, the Legislature also created the Indian Gaming Special Distribution Fund ("Distribution Fund"). Cal. Gov't Code § 12012.85. The 1999 Compacts direct each gaming tribe to contribute to the Distribution Fund a portion of its revenues calculated according to the number of gaming devices operated by the tribe on September 1, 1999, and the "net wins" of those devices. 1999 Compacts § 5.1(a). The Legislature may then appropriate funds from the Distribution Fund to make up for "shortfalls that may occur in the . . . Revenue . . . Fund. This shall be the priority use of moneys in the . . . Distribution Fund." Cal. Gov't Code § 12012.85(d).

In 2002, the Commission notified Colusa and other Compact Tribes that it would conduct a round of gaming device license draws that September. Prior to the draw, Colusa was operating its threshold number of 523 gaming devices for

---

[2]For purposes of revenue sharing, the 1999 Compacts define a Compact Tribe as a tribe having a compact with the State authorizing Class III Gaming; Non-Compact Tribes are defined as federally recognized tribes that are operating fewer than 350 gaming devices, whether or not such a tribe has a compact with the State.

which it did not need licenses. Colusa notified the Commission of its intent to draw 250 licenses and tendered a $312,500 check as its non-refundable one-time pre-payment fee. Colusa was placed in the third priority tier and received 250 licenses. In November 2003, the Commission notified Colusa that it would conduct another round of draws in December 2003. Colusa requested 377 licenses and submitted a pre-payment of $471,250. Colusa was assigned to the fourth priority tier, a classification that Colusa challenges in this litigation. Colusa alleges that it was assigned to the fourth tier because it had previously drawn some licenses in the third tier, even though the number of gaming devices it operated after the earlier drawing should have continued to place it in the third tier. The December drawing was held with Colusa in the fourth tier and it received no licenses. The Commission refunded the pre-payment for those requested licenses in full. In October 2004, the Commission conducted a third draw. Colusa advanced fees for 341 licenses and was again placed in the fourth priority tier. It received only 73 licenses. Colusa anticipates receiving a refund of the pre-payment on the licenses that it did not receive in the draw.

Immediately after the December 2003 draw, Colusa requested that the Governor meet and confer with the Tribe with regard to (1) Colusa's assignment to the fourth priority tier in the December 2003 draw; (2) the Commission's determination of the statewide aggregate number of licenses available to all tribes for issuance under the 1999 Compacts; (3) the Commission's role and authority in the draw process; and (4) the Commission's retention of the $312,500 tendered by the Tribe in connection with its draw of 250 licenses in September 2002. After an unsuccessful meeting, the State formally rejected each of Colusa's positions. Colusa then initiated this litigation.

In its complaint, Colusa asserts that the State, through the actions of the Commission, breached the Compact by: (1) excluding Colusa from the third priority tier in the December

2003 and October 2004 draws; (2) unilaterally determining the aggregate number of licenses authorized by the Compact; (3) refusing to refund Colusa's non-refundable one-time pre-payment fee in conjunction with the licenses Colusa obtained in September 2002 and October 2004; (4) conducting rounds of draws of licenses without authority; and (5) failing to negotiate in good faith. The State filed a motion for judgment on the pleadings, seeking to dismiss Colusa's first, second, third, and fourth claims for failure to join necessary and indispensable parties and its fifth claim for failure to exhaust non-judicial remedies.[3] The district court granted the State's motion to dismiss and entered judgment in its favor. Colusa appeals.

While Colusa's appeal was pending, the State negotiated and executed amendments to the 1999 Compacts individually with at least five Indian tribes, not including Colusa.[4] These

[3]Colusa lists its fifth cause of action—failure to negotiate in good faith —among its grounds for appeal. It does not, however, advance any argument in support of reversing the district court's judgment with respect to that claim. Accordingly, we deem the claim abandoned. *See* Fed. R. App. P. 28(a)(9)(A); *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992) ("Issues raised in a brief which are not supported by argument are deemed abandoned.") (quoting *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988)). We therefore affirm the district court's dismissal of that claim.

[4]Amendment to the Tribal-State Compact Between the State of California and the Agua Caliente Band of Cahuilla Indians (Aug. 8, 2006); Amendment to the Tribal-State Compact Between the State of California and the Morongo Band of Mission Indians (Aug. 29, 2006); Amendment to the Tribal-State Compact Between the State of California and the Pechanga Band of Luiseno Mission Indians (Aug. 28, 2006); Amendment to the Tribal-State Compact Between the State of California and the Sycuan Band of the Kumeyaay Nation (Aug. 30, 2006); Amendment to the Tribal-State Compact Between the State of California and the San Manuel Band of Serrano Mission Indians of the San Manuel Reservation (Aug. 28, 2006); *see also* Indian Gaming, 72 Fed. Reg. 71,939-02–71,939-04 (Dec. 19, 2007) (notices); Indian Gaming, 73 Fed. Reg. 3,480-01 (Jan. 18, 2008) (notice); California Gambling Control Commission, Tribal-State Gaming Compacts, http://www.cgcc.ca.gov/compacts.asp (last visited July 31,

amended compacts, which became effective between December 2007 and January 2008 ("2007 Amended Compacts"), provide for the operation of up to 22,500 additional gaming devices outside the limits established by the 1999 Compacts.[5] *See* 2007 Amended Compacts § II.B (amended § 4.3.1(a)). In addition, four of the five 2007 Amended Compacts provide that, if a shortfall occurs in the Revenue Fund, "the State Gaming Agency shall direct a portion of the revenue contribution" made by each of the 2007 Compact Tribes "to increase the revenue contribution to the [Revenue Fund] in an amount sufficient to ensure the [Revenue Fund] has sufficient resources for each eligible recipient Indian tribe to receive quarterly payments pursuant to Government Code Section 12012.90." *E.g.*, Amendment to the Tribal-State Compact Between the State of California and the Morongo Band of Mission Indians § II.B (Aug. 29, 2006) (amended § 4.3.1.(*l*)), *available at* http://www.cgcc.ca.gov/compacts.asp (last visited July 31, 2008). The aggregate revenue contribution made by these four tribes, which is therefore available to fill any shortfall in the Revenue Fund, exceeds $140 million per year. *See* 2007 Amended Compacts § II.B (amended § 4.3.1(b)(i)).

---

2008). We take judicial notice of these amended compacts pursuant to Federal Rule of Evidence 201, which "permits us to 'take judicial notice of the records of state [entities] and other undisputed matters of public record,' [including] executed Compact[s] . . . not in the district court record." *Wilbur v. Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005) (quoting *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004)). We note and overrule the State's objection to our consideration of these materials.

[5]The 2007 Amended Compacts allow the amending tribes to continue operating machines pursuant to licenses previously issued under the pool provision as well as machines which were operated on September 1, 1999. The pool provision licenses remain in force even though the 2007 Amended Compacts repeal the pool provision itself.

## DISCUSSION

In addressing the State's Rule 19 motion to dismiss Colusa's claims for failure to join required parties, "the proper approach is first to decide whether the tribes are . . . '[required]' parties who should normally be joined under the standards of Rule 19(a)." *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022 (9th Cir. 2002).[6] If, as the district court concluded in this case, the tribes are required parties, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."[7] Fed. R. Civ. P. 19(b). On appeal, we review the district court's Rule 19 determinations for an abuse of discretion. *Am. Greyhound Racing*, 305 F.3d at 1022; *cf. Republic of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2189 (2008) (declining to address the standard of review for Rule 19(b) decisions). To the extent that in its inquiry the district court "decided a question of law, we review that determination de novo." *Am. Greyhound Racing*, 305 F.3d at 1022.

The issue that we find dispositive of all contested portions of this appeal is whether the absent tribes are "required" parties to the adjudication of Colusa's first, second, third and fourth claims within the meaning of Rule 19(a). We conclude

---

[6]The language of Federal Rule of Civil Procedure 19 has been amended since the district court's dismissal of this action. The Rules Committee advised that the changes were "stylistic only," *see* Fed. R. Civ. P. 19 advisory comm. nn. (2008), and the Supreme Court has agreed, *see Republic of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2184 (2008). Two changes are relevant to this case. First, the word "required" replaced the word "necessary" in subparagraph (a). Second, the word "indispensable" is deleted from the current text of subparagraph (b). All quotations hereinafter to materials predating the 2007 amendment are altered, with brackets, to reflect the current language of Rule 19.

[7]The parties do not dispute that the absent tribes enjoy sovereign immunity. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). Accordingly, because they have not consented to suit, they cannot be joined in this action.

that they are not, and that the district court abused its discretion in finding that the absent tribes were required parties to the disposition of these claims. We accordingly reverse the district court's judgment with respect to those claims and remand for further proceedings. Our conclusion that the absent tribes are not required parties under Rule 19(a) makes inapplicable the provisions of Rule 19(b) governing the decision whether to proceed with litigation when a required party cannot be joined; we therefore do not address the district court's determination of that issue.[8]

[1] The absent tribes are "required" parties to this action if they "claim[ ] an *interest* relating to the subject of the action and [are] so situated that disposing of the action in [their] absence may: (i) as a practical matter impair or impede [their] ability to *protect the interest*; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations *because of the interest*." Fed. R. Civ. P. 19(a)(1)(B) (emphases added).[9] A crucial premise of mandatory joinder, then, is that the absent tribes possess an interest in the pending litigation that is "legally protected." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). We have developed few categorical rules informing this inquiry. At one end of the spectrum, we have held that the interest at stake need not be "property in the sense of the due process clause." *Am. Greyhound Racing*, 305 F.3d at 1023. At the other end of the spectrum, we have recognized that the "interest must be more than a financial stake,

---

[8]For the same reason, our analysis is not affected by the Supreme Court's recent holding in *Pimentel*, 128 S. Ct. at 2190. In *Pimentel*, the Supreme Court reversed the decision of a panel of this court because it had not "giv[en] full effect to sovereign immunity" in its Rule 19(b) calculus. *Id.* Because in our case the absent tribes are not required parties under Rule 19(a), we are unaffected by the Rule 19(b) analysis set forth in *Pimentel*.

[9]The State does not contend that, in the absence of the other Compact (or Non-Compact) Tribes, "the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

and more than speculation about a future event." *Makah*, 910 F.2d at 558 (citations omitted); *see also N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468-69 (9th Cir. 1986) (holding that miners who had submitted mining plans to National Park Service were not necessary parties to an action to enjoin mining in parks until environmental impact statements were prepared). Within the wide boundaries set by these general principles, we have emphasized the "practical" and "fact-specific" nature of the inquiry. *Makah*, 910 F.2d at 558; *see also Bakia v. County of Los Angeles*, 687 F.2d 299, 301 (9th Cir. 1982) (per curiam) ("There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a) . . . . The determination is heavily influenced by the facts and circumstances of each case."). Accordingly, an interest that "arises from terms in bargained contracts" may be protected, but we have required that such an interest be "substantial." *Am. Greyhound Racing*, 305 F.3d at 1023. An interest in a fixed fund or limited resource that the court is asked to allocate may also be protected. *Makah*, 910 F.2d at 558-59. At the same time, an absent party has no legally protected interest at stake in a suit merely to enforce compliance with administrative procedures. *See N. Alaska*, 803 F.2d at 469; *Makah*, 910 F.2d at 559 ("The absent tribes would not be prejudiced because all of the tribes have an equal interest in an administrative process that is lawful.").

**The Size of the License Pool**

Colusa challenges the Commission's computation of the statewide maximum number of licences that may be issued under the 1999 Compacts. The district court dismissed Colusa's claim, concluding that the other Compact Tribes are required parties in the absence of which the action should be dismissed. Although we agree with the district court that some absent tribes may prefer that the State issue fewer licenses, we reverse its dismissal of Colusa's claim because the absent tribes' only interest relevant for Rule 19(a) purposes is free-

dom from competition. We hold that this interest, without more, is not "legally protected" for Rule 19 purposes.

**[2]** It is important to identify clearly the Compact Tribes' interest at stake. Those Compact Tribes that currently enjoy a dominant position in the gaming industry will likely prefer to maintain a low statewide maximum number of licenses available under the 1999 Compacts. On the other hand, those who intend to expand their gaming operations and compete with the dominant gaming tribes will gladly accept an increase in the size of the license pool created by the 1999 Compacts. Indeed, the State itself repeatedly characterizes the absent tribes' interest at stake as the preservation of their "market share" within California's gaming industry. Properly framed, then, the respective advantages that various tribes may enjoy under a more generous or restrictive interpretation of the pool provision are an economic incident of their market positions under a common licensing regime.

**[3]** The mere fact that the outcome of Colusa's litigation may have some financial consequences for the non-party tribes is not sufficient to make those tribes required parties, however. *See, e.g.*, *Makah*, 910 F.2d at 558 ("[The] interest must be more than a financial stake."). The absent tribes must have a legally protected interest and, on this record, the only potential protection lies in the 1999 Compacts themselves. The interest could be protected if it actually "arises from terms in bargained contracts." *Am. Greyhound Racing*, 305 F.3d at 1023. We conclude that it does not.[10] The 1999 Com-

---

[10]We do not decide the broader question whether avoiding competition ever qualifies as a legally protected interest under Rule 19(a) in the context of Indian gaming. We note, however, that the legislative history of IGRA casts considerable doubt on a state's assertion of any such interest in the context of Indian gaming; the Senate's Select Committee on Indian Affairs reported its intent that the states not use IGRA's Class III gaming compact requirement as a protectionist measure, although that concern was directed at the protection of non-tribal operators, not absent tribes as in this case. *See* S. Rep. No. 100-446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083.

pacts do not purport to establish, through the license pool provision or otherwise, an overarching limit on the number of gaming licenses generally available in California. Rather, they place a limit only on the smaller universe of licenses that may be issued *under the 1999 Compacts*.[11] This limit alone is insufficient to determine the competitive landscape of California's gaming industry, for it leaves the State at liberty to issue an unlimited number of licenses outside the pool created by the 1999 Compacts. Indeed, the State has recently negotiated amendments, now in effect, to the 1999 Compacts with several tribes. These amendments provide for the operation of up to 22,500 additional gaming devices outside the pool created by the 1999 Compacts. These actions reflect the reality that the 1999 Compacts afford no express or implied protection against competition per se. The interest of some of the absent tribes in avoiding competition does not "arise[ ] from terms in bargained contracts," *id.*, and is accordingly not "legally protected" under the circumstances of this case. The absent 1999 Compact tribes thus are not required parties for litigation of Colusa's claim seeking to raise the aggregate limit on licenses under the 1999 Compacts.

In reaching this conclusion, we reject the State's contention that its licensing scheme is comparable to the system for the allocation of limited resources at issue in *Makah*. In *Makah*, we held that absent tribes had a protected interest that made them necessary parties to a claim for amendment of a pre-existing allocation of a finite resource—a particular year's off-shore salmon harvest—because an allocation to one tribe necessarily entailed the parallel deprivation of another. *Makah*, 910 F.2d at 556-57. The resource at issue was finite: ocean fishing of salmon in excess of the total permitted harvest would jeopardize the survival of the species' population in the region's weakest runs. *Id.* at 557. In contrast, the gam-

---

[11]The 1999 Compacts establish a formula for a limit on the "number of machines that all Compact Tribes in the aggregate may license *pursuant to this Section* . . . ." 1999 Compacts § 4.3.2.2(a)(1) (emphasis added).

ing licensing scheme at issue here rations a resource—licenses for gaming devices—that is, if not for purely economic considerations, effectively unlimited. Thus, for the reasoning of *Makah* to be at all relevant to this case, the State would need to show that, despite not being *inherently* finite, the resource of licenses for gaming devices is rendered at least *legally* finite by operation of the terms of the 1999 Compacts. As we have already explained, however, the statewide cap put in place by the 1999 Compacts does not, without more, constrain the number of gaming licenses generally available in California. Thus, the absent tribes have no legally protected interest in the determination of the license pool that may be issued under the 1999 Compacts.

**[4]** Finally, we also find it significant that, unlike the plaintiff in *American Greyhound Racing*, Colusa does not seek to invalidate compacts to which it is not a party; this litigation is not "*aimed*" at the other tribes and their gaming. *Am. Greyhound Racing*, 305 F.3d at 1026. On the contrary, Colusa seeks to enforce a provision of its own Compact which may affect other tribes only incidentally. Under the specific circumstances of this case, the Compact Tribes are not required parties to the adjudication of Colusa's challenge to the size of the 1999 Compact license pool.[12]

## Colusa's Placement in Priority Tier IV

Colusa next challenges its placement in the fourth priority tier since the December 2003 draw. The district court dismissed Colusa's claim on the ground that the absent Compact Tribes "would be deprived of th[eir gaming] licenses or the

---

[12]We also are not persuaded by the State's unexplained contention that adjudication of Colusa's challenge to the Commission's determination of the statewide cap would expose the State to a significant risk of "inconsistent obligations" within the meaning of Rule 19. Should different district courts reach inconsistent conclusions with respect to the size of the license pool created under the 1999 Compacts, such inconsistencies could be resolved in an appeal to this court.

opportunity to obtain those licenses." This ruling was error, for it misconstrues both the nature of the absent tribes' interest in the licenses that may be issued in the future and the consequences of litigating Colusa's challenge to its placement in the fourth tier. It is true that, if one assumes that the license pool is finite, an order to issue new licenses to Colusa may render those licenses unavailable to the absent tribes, thereby depriving them of their "opportunity" to obtain them. Nonetheless, we conclude that the absent tribes' interest in their "opportunity" to obtain future licenses is insufficient to render them "required" parties for Rule 19(a) purposes.

[5] Once again, it is necessary carefully to identify the absent parties' interest at stake. To the extent that the "opportunity" to obtain licenses means the entitlement to participate in future rounds of draws, the litigation of Colusa's tier assignment will not "as a practical matter impair or impede the [absent tribes'] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). The absent tribes remain free to enter future draws. The possible complaint of the absent tribes, however, is that assignment of Colusa to a higher priority tier may dilute the probability that the absent tribes will obtain the licenses they apply for. But the absent tribes have no guarantee against having to compete with any particular number of tribes in their tier or a higher-priority tier. Nor can it be said that any particular degree of likelihood of receiving licenses "arises from terms in bargained contracts" and, more specifically, from the 1999 Compacts. *Am. Greyhound Racing*, 305 F.3d at 1023. Under IGRA, entering into a compact with state authorities is, of course, a threshold requirement for Indian tribes wishing to develop Class III gaming operations. *See* 25 U.S.C. § 2710(d)(1)(C). In that sense, if it were not for the 1999 Compacts, the absent tribes would have *no* likelihood of ever obtaining any licenses. In our "practical" and "fact-specific" Rule 19 inquiry, however, we require more than mere "but-for" causation before recognizing a legally protected interest. *Makah*, 910 F.2d at 558; *see also Bakia*, 687 F.2d at 301. Here, in addition to the threshold requirement of

a compact, a number of other factors determine the actual likelihood that any given tribe will receive any licenses. As the facts of this litigation demonstrate, crucial among these factors is the past, present and future demand for new licenses by other tribes placed in higher or equal priority tiers. A tribe wishing to obtain additional licenses has absolutely no control over the overall demand for new licenses, or over the number of tribes that may be placed in the same or a higher priority tier. Thus, the causal connection between the terms of the 1999 Compacts and an absent tribe's likelihood of obtaining future licenses is attenuated indeed. *See Makah*, 910 F.2d at 558 ("speculation about a future event" does not give rise to a legally protected interest). We therefore conclude that no particular degree of likelihood of obtaining licenses "arises from terms in bargained contracts," *Am. Greyhound Racing*, 305 F.3d at 1023. As a consequence, the opportunity to obtain licenses does not qualify as a legally protected interest for Rule 19 purposes.

The interest of the absent tribes in Colusa's tier assignment is therefore quite different from the interest of the absent tribes in *American Greyhound Racing*. In that case, we emphasized that the gaming compacts between Arizona and the Indian tribes, which were the subject of that litigation, "provide[d] for automatic renewal if neither party gives the requisite notice of termination. [That] provision [was] an integral part of the existing compacts, and was part of the bargain that the tribes entered with the State." *Am. Greyhound Racing*, 305 F.3d at 1023. We reversed the district court's injunction because it modified the compacts of the absent tribes and stripped those tribes of the very object of their bargain— automatic renewal unless the parties affirmatively terminated the compacts. *Id.* Here, Colusa's tier claim does not negate any absent tribe's right to its place in any tier, or its right to participate in the manner guaranteed by the Compacts. Colusa's claim at most increases the competition for licenses to be drawn but, as we have explained, the 1999 Compacts do not guarantee freedom from competition, nor do they grant an

entitlement to draw any specific license or number of licenses or even a predetermined place in line that may entail a particular likelihood of obtaining new licenses. Thus, *American Greyhound Racing* does not control, because litigation of Colusa's claim for placement in a higher tier cannot impair any Compact rights that were the object of the bargain of the absent tribes.

**[6]** Different considerations apply to the interest of the absent tribes in the licenses that they have already received. We do not question that the Compact Tribes which requested and obtained licenses in the December 2003 and subsequent draws by placing ahead of Colusa have a legally protected interest in those licenses. In order for the absent tribes to be "required" parties under Rule 19, however, the State must also show that their ability to protect their interest "may . . . as a practical matter [be] impair[ed]" by the litigation of Colusa's claim to a higher tier placement. Fed. R. Civ. P. 19(a)(1)(B)(i). To the extent that Colusa seeks prospective relief in the form of a declaration that may place it in the third priority tier in future draws, such relief, if granted, would not prejudice the absent tribes' legally protected interest in their *existing* licenses.[13] It was therefore an abuse of discretion for the district court to prohibit Colusa from litigating the legality of the Commission's interpretation of the tier system. Like the *Makah* court, however, we emphasize that "the scope of the relief available [to Colusa] . . . is narrow." *Makah*, 910 F.2d at 559. Accordingly, to the extent Colusa seeks injunctive relief requiring the Commission to restore Colusa to the position it would have occupied under its claimed interpretation of the Compact by issuing new licenses, such relief may be

---

[13]The State's contention that prospective relief is inapposite because Colusa's tier placement would be determined by a formula not available to the other Compact Tribes is unavailing. As we explained, the 1999 Compacts do not create a legally protected interest in either freedom from competition, *see supra* p. 14927-28, or a specific place in line in future draws, *see supra* p. 14932-33.

granted only insofar as it does not interfere with the validity or distribution of the licenses already assigned to the other Compact Tribes.[14]

**Colusa's Pre-payment Fees**

In its next claim, Colusa seeks restitution of the $403,750 it tendered to the Commission as pre-payment for the 323 licenses it has obtained in the draws thus far. The Commission, as trustee of the Revenue Fund, is holding the pre-payment as a credit against future annual fees. Colusa argues that the pre-payment should be refunded because Colusa will not owe any annual fees until it draws at least 350 licenses—an illusory prospect so long as the tribe is assigned to the fourth priority tier.[15] The district court dismissed the claim because Colusa's non-refundable pre-payment is deposited in the Revenue Fund and, "to the extent that there is insufficient money to pay each Non-Compact Tribe $1.1 million per year, an award to plaintiff will lessen the amount of money distributed to each other tribe." Thus the district court held that the claim could not be litigated in the absence of the non-Compact tribes eligible for distributions from the Fund.

---

[14]We reject the State's argument that, if Colusa prevailed on its first claim that it was entitled to a higher tier placement, the entire license draw process would have to be retroactively undone. Colusa does not seek this remedy and we see no reason why a court of equity would be compelled to grant it.

We also reject the State's contention that "the other 1999 Compact tribes, which have been placed in tiers based on the Commission's interpretation of the tier process, would nevertheless have suffered prejudice." The licenses that have already been issued comprise the absent tribes' only legally protected interest at stake. As we have made clear, however, none of those licenses may be invalidated at the remedial stage.

[15]The Tribe drew 250 licenses in September 2002, and another 73 in October 2004, for a total of 323 licenses. Colusa represents that it will not be permitted to draw any more licenses so long as it remains in a low-priority tier.

**[7]** We need not decide whether the district court's Rule 19(a) determination was correct. The State's intervening amendment and ratification of its 1999 Compacts with several gaming tribes, which is memorialized in the 2007 Amended Compacts, have significantly altered the financing of the Revenue Fund. Four of the 2007 Amended Compacts that are now in effect contain the following provision:

> If it is determined that there is an insufficient amount in the Indian Gaming Revenue Sharing Trust Fund in a fiscal year to distribute the quarterly payments pursuant to Government Code Section 12012.90 to each eligible recipient Indian tribe, then the State Gaming Agency shall direct a portion of the revenue contribution in Section 4.3.1(b)(i) to increase the revenue contribution to the Indian Gaming Revenue Sharing Trust Fund in Section 4.3.2.2 in an amount sufficient to ensure the Indian Gaming Revenue Sharing Trust Fund has sufficient resources for each eligible recipient Indian tribe to receive quarterly payments pursuant to Government Code Section 12012.90.

*E.g.*, Amendment to the Tribal-State Compact Between the State of California and the Morongo Band of Mission Indians § II.B (Aug. 29, 2006), (amended § 4.3.1(*l*)). The "revenue contribution" specified in amended section 4.3.1(b)(i) of these four 2007 Amended Compacts, in turn, guarantees an annual aggregate inflow to the State in excess of $140 million. *See* 2007 Amended Compacts § II.B (amended § 4.3.1(b)(i)). Should a shortfall develop in the Revenue Fund, the Commission "shall" direct a sufficient portion of this amount to the Revenue Fund to make up for the shortfall. The potential backfill of more than $140 million per year guaranteed by the 2007 Amended Compacts appears as a practical matter to be more than sufficient to make up for any shortfall in the Revenue Fund.[16] We therefore conclude that the refund of Colusa's

---

[16]As of September 20, 2007, 71 Indian tribes were eligible to receive the $1.1-million annual distribution from the Revenue Fund. *See, e.g.*, Califor-

$403,750 pre-payment fee, if appropriate under the Compact, will not "as a practical matter impair or impede [the Non-Compact Tribes'] ability to protect [their] interest" in receiving their annual $1.1-million distribution as required by California state law. Fed. R. Civ. P. 19(a)(1)(B)(i).[17]

In the alternative, the State contends that the Compact Tribes are also required parties to the pre-payment fee claim. It argues that Colusa's success in obtaining its refund would impair the Compact Tribes' ability to protect their interest in "the 1999 Compact's interpretation and the fulfillment of its terms by all 1999 Compact tribes." The State's argument sweeps much too broadly. Nothing in the Compact establishes any obligation towards the other Compact Tribes insofar as the payment or refundability of Colusa's advance fees into the Revenue Fund are concerned.[18] With respect to the pre-payment provision, the 1999 Compacts are quintessentially bilateral. Accordingly, the Compact Tribes' relevant Rule 19 interest must arise, if at all, from the bare fact that the Compact Tribes are simultaneously parties to identical *bilateral* compacts with the State. We have never held that the mere coincidence of parallel and independent contractual obligations vis-a-vis a common party requires joinder of all simi-

---

nia Gambling Control Commission, Revenue Sharing Trust Fund Recipients (Sept. 20, 2007), *available at* http://www.cgcc.ca.gov/ rstfi/2008/DistribFundReport020503%20% 20-%2 003312008.pdf (last visited July 31, 2008).

[17]We reject the State's argument that "actual implementation (which is not described in [the 2007 Compacts]) could result in delayed reimbursement" to the Non-Compact Tribes. Rule 19 requires "more than speculation about a future event." *Makah*, 910 F.2d at 558 (citations omitted).

[18]It is true that, under the Compact, Colusa "agree[d] *with all other Compact Tribes* . . . that each Non-Compact Tribe in the State shall receive the sum of $1.1 million per year." 1999 Compacts, § 4.3.2.1(a) (emphasis added). No reciprocal obligation to *contribute* any specific amount or forgo otherwise legitimate claims to the pre-payment fees, however, arises from this joint commitment.

larly situated parties. *Cf. Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ("[A] *party to a contract* is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract.") (emphasis added). The mutuality-of-party requirement of res judicata and defensive collateral estoppel ensures that the similarly situated absent tribes will not be prejudiced if and when they decide to challenge the Commission's interpretation of the refund provision of the 1999 Compacts.[19] On the facts of this case, we decline the State's invitation to extend the scope of mandatory joinder.

[8] Finally, we reject the State's argument that failure to join the Compact Tribes may expose the State to inconsistent obligations. As the First Circuit has cogently explained,

> "[i]nconsistent obligations" are not . . . the same as inconsistent adjudications or results. Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum.

*Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir. 1998) (per curiam) (footnote and citations omitted); *see also* 4 James Wm. Moore et al., Moore's Federal Practice-Civil

---

[19]We also note that the State's contention that Colusa's success would impair "the fulfillment of [the 1999 Compacts'] terms by all Compact tribes" is vitiated by its circular reasoning. If Colusa succeeds in its claim, it will obtain relief that will, by definition, "fulfill" the pre-payment term of the Compact. In other words, the only "fulfillment" that Colusa's claim, if successful, would impair is that of the *Commission*'s current interpretation of the provision. The Compact Tribes, however, have no "legally protected" interest in the "fulfillment" of the *Commission*'s particular interpretation of the Compact.

§ 19.03[4][d] (2008). We adopt the approach endorsed by the
First Circuit. Accordingly, the possibility that the State may
have to refund Colusa's pre-payment fees while adhering to
a different interpretation of the Compact in its dealings with
some other tribes does not, without more, rise to the level of
creating a "substantial risk" of incurring "inconsistent obliga-
tions." Fed. R. Civ. P. 19(a)(1)(B)(ii).

### The Commission's Authority to Conduct Rounds of Draws

Colusa finally argues that the Commission lacks authority
under the compact unilaterally to conduct draws of gaming
device licenses. As relief, Colusa requests a declaration that
the Commission "has no authority under the Compact unilat-
erally to administer the system established under the Compact
for the issuance of Gaming device licenses, but only to do so
in consultation with the Tribe." The district court concluded
that, if Colusa "prevailed, the relief would deprive absent par-
ties of their legal entitlements to the licenses awarded pursu-
ant to an invalid process." We reverse the district court's
determination because it is contrary to our decision in *Makah*.

**[9]** In *Makah*, we held that the absent tribes were not
required parties to the adjudication of the plaintiff tribe's
"procedural claims"—its claim that the harvest quotas
imposed by the Secretary of Commerce "were the product of
commitments made outside the administrative process."
*Makah*, 910 F.2d at 557 (internal quotation marks omitted).
We reasoned that "[t]he absent tribes would not be prejudiced
because all of the tribes have an equal interest in an adminis-
trative process that is lawful." *Id.* at 559. In so holding, we
also made clear that Rule 19 required "the scope of the relief
available to the Makah on their procedural claims [to be] nar-
row" and limited to prospective relief. *Id.* We find this reason-
ing dispositive in this case as well. Much like their
counterparts in *Makah*, the absent tribes "have an equal inter-
est in an administrative process that is lawful," *id.*—that is,

that the Commission not conduct the draws of licenses *ultra vires*. Moreover, as we have already made clear, Rule 19 necessarily confines the relief that may be granted on Colusa's claims to remedies that do not invalidate the licenses that have already been issued to the absent Compact Tribes. *See Makah*, 910 F.2d at 559. Thus, we reverse the district court's dismissal of Colusa's fourth claim, albeit with the proviso that, were Colusa to prevail on the merits, no existing license may be invalidated at the remedial stage.[20]

## CONCLUSION

We affirm the district court's judgment dismissing Colusa's claim for failure to negotiate in good faith. We reverse the district court's judgment dismissing Colusa's other claims on the pleadings, and remand for further proceedings consistent with this opinion. Colusa is entitled to its costs on appeal.

**AFFIRMED   IN   PART;   REVERSED   AND REMANDED IN PART.**

---

[20]We reject the State's contention that, if Colusa prevailed in establishing its fourth claim, the existing licenses would necessarily be void *ab initio*. It is true that, in *Lockyer v. City and County of San Francisco*, the Supreme Court of California held that marriage licenses issued by the City of San Francisco to same-sex couples in violation of state law were "void and of no legal effect from their inception." 33 Cal. 4th 1055, 1113 (2004). In that case, however, the Supreme Court of California emphasized the "unusual, perhaps unprecedented, set of circumstances" surrounding the invalidation of the marriage licenses in question. *Id.* Moreover, in reaching its conclusion, the court relied exclusively on the relevant provisions of California's Family Code and on case law addressing specifically marriages celebrated in violation of state law. *Id.* at 1113-14. Thus, *Lockyer* is not controlling. The parties have directed our attention to no other case—and we could find none—in support of the proposition that, under California law, the district court may not limit relief to future conduct if Colusa prevailed on the merits of its claim.