**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DINE CITIZENS AGAINST RUINING
OUR ENVIRONMENT; SAN JUAN
CITIZENS ALLIANCE; AMIGOS
BRAVOS; SIERRA CLUB; CENTER FOR
BIOLOGICAL DIVERSITY,
*Plaintiffs-Appellants*,

v.

BUREAU OF INDIAN AFFAIRS; UNITED
STATES DEPARTMENT OF INTERIOR;
UNITED STATES OFFICE OF SURFACE
MINING RECLAMATION AND
ENFORCEMENT; UNITED STATES
BUREAU OF LAND MANAGEMENT;
DAVID BERNHARDT,* in his official
capacity as Secretary of the U.S.
Department of Interior; UNITED
STATES FISH AND WILDLIFE SERVICE,
*Defendants-Appellees*,

ARIZONA PUBLIC SERVICE
COMPANY; NAVAJO TRANSITIONAL
ENERGY COMPANY LLC,
*Intervenor-Defendants-Appellees.*

No. 17-17320

D.C. No.
3:16-cv-08077-
SPL

OPINION

---

* David Bernhardt has been substituted for his predecessor, Sally Jewell, under Fed. R. App. P. 43(c)(2).

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted March 7, 2019
Phoenix, Arizona

Filed July 29, 2019

Before:  Sandra S. Ikuta and Michelle T. Friedland, Circuit
Judges, and Frederic Block,** District Judge.

Opinion by Judge Friedland

## SUMMARY***

**Joinder / Tribal Sovereign Immunity**

The panel affirmed the district court's dismissal,
pursuant to Federal Rules of Civil Procedure 19 and
12(b)(7), of an action brought by a coalition of tribal,
regional, and national conservation organizations who sued
the United States Department of the Interior, its Secretary,
and several bureaus within the agency, challenging a variety
of agency actions that reauthorized coal mining activities on
land reserved to the Navajo Nation.

---

** The Honorable Frederic Block, United States District Judge for
the Eastern District of New York, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

Plaintiffs alleged that the agency actions violated the Endangered Species Act and the National Environmental Policy Act. The Navajo Transitional Energy Company, a corporation wholly owned by the Navajo Nation that owns the Navajo Mine, intervened in the action for the limited purpose of moving to dismiss under Rules 19 and 12(b)(7). The Navajo Transitional Energy Company asserted that it was a required party but that it could not be joined due to tribal sovereign immunity, and that the lawsuit could not proceed without it.

The panel held that the Navajo Transitional Energy Company has a legally protected interest in the subject matter of this suit that would be impaired in its absence. The panel reasoned that if plaintiffs succeeded in their challenge and the agency actions were vacated, the Navajo Transitional Energy Company's interest in the existing lease, rights-of-way, and surface mining permits would be impaired. Without the proper approvals, the Mine could not operate, and the Navajo Nation would lose a key source of revenue in which the Navajo Transitional Energy Company had already substantially invested.

The panel next held that because no other party to the litigation could adequately represent the Navajo Transitional Energy Company's interests, the district court did not err in determining that the Company was a party that must be joined if feasible under Rule 19(a). The panel held that the Federal Defendants could not be counted on to adequately represent the Company's interests because although the Federal Defendants had an interest in defending their decisions, their overriding interest must be in complying with environmental laws. This interest differed in a meaningful sense from the Navajo Transitional Energy Company's and the Navajo Nation's sovereign interest in

ensuring that the Mine and the Four Corners Power Plant, which buys coals exclusively from the Mine, continued to operate and provide profits to the Navajo Nation. The panel further held that defendant, the Arizona Public Service Company, did not share the Navajo Nation's sovereign interests in controlling its own resources and in the continued operation of the Mine and Power Plant.

The panel held that due to tribal sovereign immunity, the Navajo Transitional Energy Company could not feasibly be joined as a party to this litigation. The panel held that the district court correctly determined that the Navajo Transitional Energy Company was an "arm" of the Navajo Nation that enjoyed the Nation's immunity from suit. The panel noted that the Company is wholly owned by the Navajo Nation and is organized pursuant to Navajo law. It was created specifically so that the Navajo Nation could purchase the Mine. Applying the Rule 19(b) factors, the panel held that the district court did not err in concluding that the litigation could not, in good conscience, continue in the Navajo Transitional Energy Company's absence.

The panel rejected plaintiffs' and United States' request to apply the "public rights" exception to hold that this litigation could continue in the National Transitional Energy Company's absence. The panel held that although plaintiffs nominally sought only a renewed National Environmental Policy Act and Endangered Species Act process, the implication of their claims was that Federal Defendants should not have approved the mining activities in their exact form. The result plaintiffs sought, therefore, threatened the National Transitional Energy Company's legal entitlements, and accordingly, the public rights exception did not apply.

**COUNSEL**

Shiloh Silvan Hernandez (argued) and Matt Kenna, Western Environmental Law Center, Helena, Montana; Michael Saul, Center for Biological Diversity, Denver, Colorado; John Barth, Hygiene, Colorado; for Plaintiffs-Appellants.

Aukjen T. Ingraham (argued), Sara Kobak, Brien J. Flanagan, and Sarah Roubidoux Lawson, Schwabe, Williamson & Wyatt P.C., Portland, Oregon, for Intervenor-Defendant-Appellee Navajo Transitional Energy Company, LLC.

Stacey L. VanBelleghem (argued), Claudia M. O'Brien, Roman Martinez, and Devin M. O'Connor, Latham & Watkins LLP, Washington, D.C., for Intervenor-Defendant-Appellee Arizona Public Service Company.

Rachel Heron (argued) and Andrew C. Mergen, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

Ethel B. Branch, Attorney General; Paul Spruhan, Assistant Attorney General; Navajo Nation Department of Justice, Window Rock, Arizona; for Amicus Curiae Navajo Nation.

## **OPINION**

FRIEDLAND, Circuit Judge:

A coalition of tribal, regional, and national conservation organizations ("Plaintiffs") sued the U.S. Department of the Interior, its Secretary, and several bureaus within the agency, challenging a variety of agency actions that reauthorized coal mining activities on land reserved to the Navajo Nation. Plaintiffs alleged that these actions violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* The Navajo Transitional Energy Company ("NTEC"), a corporation wholly owned by the Navajo Nation that owns the mine in question, intervened in the action for the limited purpose of moving to dismiss under Federal Rules of Civil Procedure 19 and 12(b)(7). NTEC argued that it was a required party but that it could not be joined due to tribal sovereign immunity, and that the lawsuit could not proceed without it. The district court agreed with NTEC and dismissed the action.[1] We affirm.

---

[1] At the parties' joint request, we take judicial notice of the existence of the following documents and their contents: (1) Record of Decision for the Four Corners Power Plant and Navajo Mine Energy Project (July 14, 2015); (2) Final Environmental Impact Statement for the Four Corners Power Plant and Navajo Mine Energy Project (May 1, 2015); and (3) Environmental Assessment and Finding of No Significant Impact for Navajo Mine Permit Transfer Application, Navajo Reservation, New Mexico (Nov. 2013). *See Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015).

# I.

## A.

The Navajo Mine ("Mine") is a 33,000-acre strip mine. It produces coal from which the Four Corners Power Plant ("Power Plant") generates electricity. The Mine and Power Plant are both on tribal land of the Navajo Nation within New Mexico. The Mine operates pursuant to a surface mining permit issued by the Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSMRE") under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.* Transmission lines that distribute electricity from the Power Plant run west into Arizona through lands reserved to the Navajo Nation and Hopi Tribe. The Mine, Power Plant, and transmission lines were built in tandem and have operated since the early 1960s.

The Navajo Nation is a federally recognized Indian tribe with its seat of government in Arizona and territory spanning areas of Arizona, Utah, and New Mexico. For many years, the Navajo Nation granted a coal mining lease to BHP Billiton Navajo Coal Company ("BHP Billiton"), a private company that owned and operated the Mine. In 2013, the Navajo Nation Council created the Navajo Transitional Energy Company (again, "NTEC") for the purpose of purchasing the Mine from BHP Billiton.

The Power Plant is owned by several utility companies, including Public Service Company of New Mexico, Tucson Electric Company, Salt River Project, and Intervenor-Defendant Arizona Public Service Company ("APS"). APS operates the Power Plant on behalf of all co-owners subject to a lease agreement, originally executed in 1960, with the Navajo Nation. Under the agreement, the Mine sells coal

exclusively to the Power Plant, and the Power Plant buys its coal exclusively from the Mine. The Navajo Nation also authorizes easements for rights-of-way over Navajo lands for the Power Plant, and both the Navajo Nation and Hopi Tribe authorize easements for rights-of-way for power transmission lines that cross tribal lands.

The Mine and the Power Plant are key sources of revenue for the Navajo Nation. Under the federally approved leases and permits that are at issue in this case, operations at the Mine and the Power Plant are expected to generate between 40 and 60 million dollars per year in revenue for the Navajo Nation.

## B.

This lawsuit stems from changes and renewals to the lease agreements, rights-of-way, and government-issued permits under which the Mine and Power Plant operate.

In 2011, APS and the Navajo Nation amended the lease governing Power Plant operations, including by extending the term of the lease through 2041. BHP Billiton (which at the time still owned the Mine) then sought a renewal of the existing surface mining permit for the Mine and a new surface mining permit that would allow operations to move to an additional area within the Mine lease area.[2]

The lease amendment and accompanying rights-of-way could not go into effect, and the surface mining permits could not be granted, without approvals from several bureaus within the Department of the Interior. First,

---

[2] When NTEC purchased the Mine from BHP Billiton, NTEC became the applicant for these permits.

OSMRE needed to approve the surface mining permits. Second, approval by the Bureau of Indian Affairs ("BIA") was required to effectuate the lease amendment. Third, BIA had ultimate responsibility to grant the associated rights-of-way for the Power Plant facilities and transmission lines that the tribes had approved. Finally, approval of the Bureau of Land Management ("BLM") was required to ensure adequate resource recovery and protection on the tribal lands.

OSMRE took the lead on considering the approval requests for the Mine. It cooperated with BIA and BLM, as well as with two additional bureaus within the Department of the Interior: the National Park Service and the Fish and Wildlife Service ("Fish and Wildlife"). OSMRE also coordinated with the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the Navajo Nation, and the Hopi Tribe on the review process.

OSMRE engaged in formal consultation with Fish and Wildlife, as required by the ESA when a project "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). In April 2015, Fish and Wildlife completed formal consultation and issued a Biological Opinion concluding that the proposed action would not jeopardize the continued existence of any of the threatened and endangered species evaluated. Relying on Fish and Wildlife's assessments in the Biological Opinion, OSMRE produced an Environmental Impact Statement ("EIS") in May 2015.

OSMRE and BIA issued a Record of Decision in July 2015, which included the approvals by OSMRE, BIA, and BLM necessary for the continued operation and expansion of the Mine. The Deputy Secretary of the Interior approved the decisions of each of these bureaus within the Department of the Interior.

Since obtaining the required permits and approvals, APS and NTEC have made significant financial investments in the Power Plant and Mine, including by implementing conservation measures required by the Record of Decision. NTEC also moved mining operations into the areas designated in the new surface mining permit.[3] Additionally, NTEC secured a new $115 million line of credit in July 2016 that paid off the original note with which NTEC had purchased the Mine, and that provided additional capital. This line of credit is secured by, among other things, the Mine itself as an asset of NTEC.

## C.

In April 2016, the plaintiff conservation organizations sued BIA, OSMRE, BLM, Fish and Wildlife, and the Department of the Interior, along with its Secretary (collectively, "Federal Defendants"). Plaintiffs challenged the opinions and approvals that authorized continued operations at the Mine and the Power Plant. Specifically, Plaintiffs alleged that Fish and Wildlife's Biological Opinion violated the requirements of the ESA, and that BIA, OSMRE, and BLM violated the ESA by relying on the faulty Biological Opinion in deciding to approve the activities at issue. Plaintiffs also alleged that Federal Defendants violated NEPA by crafting an unlawfully narrow statement of purpose and need for the project in the EIS, failing to consider reasonable alternatives, and failing to take the requisite "hard look" at various impacts of the mining

---

[3] Although the details of APS's and NTEC's investments and mining activities that have taken place since issuance of the Record of Decision are not before us, APS states in its brief that it and NTEC have invested hundreds of millions of dollars in upgrades, improvements, and conservation measures in reliance on the Record of Decision. Plaintiffs have not disputed this assertion.

complex. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) ("NEPA . . . require[s] that agencies take a 'hard look' at the environmental effects of their planned action.").

Plaintiffs sought: (1) declarations that Federal Defendants violated NEPA and the ESA; (2) orders setting aside Fish and Wildlife's Biological Opinion and Federal Defendants' Record of Decision and EIS and remanding the matter to the agencies for further analysis; (3) prospective injunctive relief prohibiting Fish and Wildlife from authorizing any adverse modification to critical habitat for, or take of, two types of fish; and (4) prospective injunctive relief prohibiting Federal Defendants from authorizing any element of the mining operations pending compliance with NEPA.

After Federal Defendants answered, APS filed a motion to intervene, which the district court granted. NTEC also sought to intervene in the action for the limited purpose of filing a motion to dismiss under Federal Rules of Civil Procedure 19 and 12(b)(7). The court granted NTEC's motion to intervene as a matter of right as owner of the Mine, and NTEC then moved to dismiss. NTEC asserted that it was a required party because of its economic interest in the Mine, that it could not be joined due to tribal sovereign immunity, and that the action could not proceed in its absence. Even though dismissal would have left their decisions intact, Federal Defendants opposed NTEC's motion to dismiss, arguing that the federal government was the only party required to defend an action seeking to enforce compliance with NEPA and the ESA.

The district court granted NTEC's motion to dismiss. The court concluded that NTEC had a legally protected interest in the subject matter of this suit, because the "relief Plaintiffs seek could directly affect the Navajo Nation

(acting through its corporation, Intervenor-Defendant NTEC) by disrupting its 'interests in [its] lease agreements and the ability to obtain the bargained-for royalties and jobs.'"  The court held that Federal Defendants could not adequately represent NTEC's interest in the litigation, because although the agencies had an interest in defending their analyses and decisions, "NTEC's interests in the outcome of this case far exceed" those of the agencies.  The court observed that, although NTEC's interests were *currently* aligned with those of Federal Defendants, there could be a "later divergence of interests" during the course of the litigation.  The court further concluded that NTEC could not be joined due to the Navajo Nation's sovereign immunity, and that the litigation could not, "in equity and good conscience," continue in NTEC's absence.

Plaintiffs timely appealed, arguing that NTEC did not have a legally protected interest in Federal Defendants' compliance with environmental laws; that even if NTEC did have such an interest, Federal Defendants would adequately represent that interest; and that even if NTEC were a required party, the litigation could continue in its absence under the "public rights exception" to traditional joinder rules.

## II.

We review a "district court's decision to dismiss [an] action for failure to join" a required party for abuse of discretion, but we review its underlying legal conclusions de novo.  *Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 997 (9th

Cir. 2011).**[4]**  When reviewing an order dismissing a case under Rule 12(b)(7) for failure to join a party, "we accept as true the allegations in Plaintiff[s'] complaint and draw all reasonable inferences in Plaintiff[s'] favor." *Id.* at 996 n.1. We review de novo the question whether a tribe feasibly can be joined. *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005).

## III.

A person or entity is a "required party" and "must be joined" if feasible if either "in that [party]'s absence, the court cannot accord complete relief among existing parties"; or if "that [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party]'s absence may . . . as a practical matter impair or impede the [party]'s ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). Under Rule 19, if the party "who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). If it cannot proceed, a motion to dismiss under Rule 12(b)(7) for failure to join a party is properly granted.**[5]**

---

**[4]** We need not decide here precisely which parts of the Rule 19 analysis are underlying legal conclusions entitled to de novo review and which parts are entitled to abuse of discretion review, because even if we reviewed every component of the Rule 19 analysis here de novo, we would affirm the district court's decision.

**[5]** Before 2007, parties that are now called "required" under Rule 19 were referred to as "necessary," and parties without whom the litigation

**A.**

NTEC argues that it is a required party that must be joined if feasible because: (1) it has a legally protected interest in the subject matter of this litigation, and (2) proceeding with the lawsuit in NTEC's absence would impair that interest. *See* Fed. R. Civ. P. 19(a)(1)(B). We agree.

**1.**

In determining whether NTEC claims a legally protected interest in the subject matter of this suit, we must "carefully . . . identify [NTEC's] interest at stake." *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 973 (9th Cir. 2008) ("*Colusa*"). "The inquiry under Rule 19(a) 'is a practical one and fact specific,'" *White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014) (quoting *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)), and "few categorical rules inform[] this inquiry," *Colusa*, 547 F.3d at 970.

To satisfy Rule 19, an interest must be legally protected and must be "more than a financial stake." *Makah*, 910 F.2d at 558. "[A]n interest that 'arises from terms in bargained contracts' may be protected, but . . . such an interest [must] be 'substantial.'" *Colusa*, 547 F.3d at 970 (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002)). "[A]n absent party has no legally protected

could not, in good conscience, continue, were referred to as "indispensable." *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 855–56 (2008). Rule 19 was revised in 2007, but the revisions were intended to be only "stylistic," and the Supreme Court has interpreted them as such. *Id.* at 855.

interest at stake in a suit merely to enforce compliance with administrative procedures." *Id.* at 971.

"If a legally protected interest exists, the court must further determine whether that interest will be *impaired or impeded* by the suit." *Makah*, 910 F.2d at 558. "As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) (quoting *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999)). Three factors are relevant to whether an existing party may adequately represent an absent required party's interests:

> whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments; whether the party is capable of and willing to make such arguments; and whether the absent party would offer any necessary element to the proceedings that the present parties would neglect.

*Id.* at 1127–28 (quotation marks omitted).

**2.**

Although an absent party has no legally protected interest at stake in a suit seeking only to enforce compliance with administrative procedures, our case law makes clear that an absent party may have a legally protected interest at stake in procedural claims where the effect of a plaintiff's successful suit would be to impair a right already granted. Under that case law, NTEC has a legally protected interest

in the subject matter of this suit that would be impaired in its absence.

In *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466 (9th Cir. 1986), we held that absent miners with mining plans and access permits pending before (but not yet approved by) the National Park Service ("NPS") did not have a legally protected interest in a suit brought by environmental groups seeking to enjoin NPS from approving such plans and permits until NPS complied with NEPA and NPS regulations. *Id.* at 469.**[6]** We explained that "[t]he subject matter of th[e] dispute concern[ed] NPS procedures regarding mining plan approval," and that although "all miners [were] interested in how stringent the requirements [would] be," "miners with pending plans ha[d] no legal entitlement to any given set of procedures." *Id.* (quotation marks omitted).

In *Makah*, we likewise held that absent tribes lacked a legally protected interest in a suit brought by the Makah Indian Tribe challenging the Secretary of Commerce's ocean fishing allotment "[t]o the extent that the Makah [sought prospective injunctive] relief that would affect only the *future conduct* of the administrative process." 910 F.2d at 559 (emphasis added). We also held, however, that absent tribes *did* have a legally protected interest "to the extent the Makah [sought] a reallocation of [a particular prior year's] harvest or challenge[d] the Secretary's [prior] inter-tribal allocation decisions." *Id.* We accordingly held that the suit could proceed but that "the scope of the relief available to the Makah on their procedural claims [was] narrow" and

---

**[6]** We did not need to reach whether the miners had a legally protected interest in *already approved* plans, because we held that any claims related to those plans were moot. *Hodel*, 803 F.2d at 469 n.2.

limited to prospective relief relating to such future processes. *Id.*

Similarly, in *Colusa*, we held that absent tribes, whose gaming compacts with California provided for the operation of "gaming devices" but limited the number of state licenses for such devices, had legally protected interests in the licenses that they already held under the compacts.  Still, we held that such interests would not be impaired by a lawsuit brought by another compact-holding tribe (Colusa) against California "[t]o the extent that Colusa [sought] prospective relief" relating to the issuance of *future* licenses, such as Colusa's request for higher priority in the draw for licenses. 547 F.3d at 974.  We explained that "Rule 19 necessarily confine[d] the relief that [could] be granted on Colusa's claims to remedies that [did] not invalidate the licenses that [had] already been issued to the absent . . . Tribes."  *Id.* at 977.

In *Kescoli v. Babbitt*, 101 F.3d 1304 (9th Cir. 1996), by contrast, we affirmed dismissal of a lawsuit in which there were legally protected interests at stake that we concluded were threatened by the retroactive effect of the relief sought in the litigation.  Specifically, we held that the Navajo Nation and Hopi Tribe both had a legally protected interest and were necessary parties to a Navajo Nation member's suit challenging a settlement reached between those tribes and the government that modified special conditions required by a mining permit issued to a company that operated a mine under lease agreements with the two tribes.  *Id.* at 1310.  We reasoned that because the settlement dictated the conditions under which mining operations could be conducted, the litigation "could affect the amount of royalties received by the Navajo Nation and the Hopi Tribe and employment opportunities for their members."  *Id.* at 1309–10.  We

explained that, unlike the prospective claim in *Makah*, the plaintiff's challenge to the settlement "could affect the Navajo Nation's and the Hopi Tribe's interests in their lease agreements and the ability to obtain the bargained-for royalties and jobs." *Id.* at 1310.

Applying these precedents, NTEC has a legally protected interest in the subject matter of this action. Although Plaintiffs' challenge is to Federal Defendants' NEPA and ESA processes (rather than to anything that NTEC has done), it does not relate only to the agencies' future administrative process, but instead may have retroactive effects on approvals already granted for mining operations. If Plaintiffs succeeded in their challenge and the agency actions were vacated, NTEC's interest in the existing lease, rights-of-way, and surface mining permits would be impaired. Without the proper approvals, the Mine could not operate, and the Navajo Nation would lose a key source of revenue in which NTEC has already substantially invested. This case is therefore like *Kescoli*, where we concluded that absent tribes were necessary because the litigation could affect already-negotiated lease agreements and expected jobs and revenue. And it is unlike either *Makah* or *Colusa*, in which we could tailor the scope of relief available to being prospective only, preventing any impairment to a legally protected interest.

### 3.

The question whether any existing party adequately represents NTEC's interest in this litigation is closer, but we conclude that none does.

In *White v. University of California*, we affirmed a district court's dismissal of a suit against the Department of the Interior under the Native American Graves Protection

and Repatriation Act ("NAGPRA") for failure to join absent tribes that we concluded could not be adequately represented by the existing defendant in the case. 765 F.3d. at 1015. *White* involved a custody dispute over human remains uncovered on land belonging to the University of California that was aboriginally occupied by members of the Kumeyaay Nation, which consists of several federally recognized tribes. *Id.* The University determined that it was required, under NAGPRA, to repatriate the remains to the Kumeyaay Cultural Repatriation Committee, which had requested repatriation. *Id.* at 1015–16. Several University professors sued to enjoin repatriation, and the district court dismissed the claim for failure to join the Repatriation Committee, which could not be joined due to tribal immunity. *Id.*

We affirmed, holding that absent Kumeyaay tribes and the Repatriation Committee had an interest that would be impaired if the suit proceeded in their absence. As we explained, if the plaintiffs "succeed[ed] in their efforts to enjoin transfer of the remains . . . then the claims of the Tribes and the Repatriation Committee [to the human remains] [would] be extinguished without the opportunity for them to be heard." *Id.* at 1027. We held that even though the University had determined that NAGPRA obligated it to repatriate the remains to the Kumeyaay, "the University [could not] sufficiently represent the interests of the Tribes or Repatriation Committee" in the litigation, because the University's and the absent tribes' interests would "not necessarily remain aligned." *Id.* The University's interest and the absent tribes' interest were of a different nature: the University had "a broad obligation to serve the interests of the people of California, rather than any particular subset, such as the people of the Kumeyaay tribes." *Id.* We theorized that if, contrary to the University's own

assessment of its obligations under NAGPRA, "a court were to determine that the [] remains should *not* be transferred to the Kumeyaay under NAGPRA, it [was] questionable whether—perhaps even unlikely that—the University and the Kumeyaay would pursue the same next course of action." *Id.* (emphasis added). We therefore upheld the district court's determination that the Kumeyaay tribes and Repatriation Committee were necessary parties.

In *Southwest Center for Biological Diversity v. Babbitt*, 150 F.3d 1152 (9th Cir. 1998), by contrast, we held that the government could adequately represent a tribe's interest in litigation brought by an environmental organization challenging, under NEPA and the ESA, the Secretary of the Interior's plan to begin using a new water storage facility. *Id.* at 1153. We recognized that the Salt River Pima-Maricopa Indian Community ("Community") had an interest in the facility's "becoming available for use as soon as possible" to store water, and we concluded that this interest would be impaired if an injunction issued in the case. *Id.* But, we reasoned, the government "share[d] a strong interest in defeating [the] suit on the merits and ensuring that the [facility was] available for use as soon as possible." *Id.* at 1154. We held that this made the government an adequate representative of the Community's interest. *Id.* at 1154. We also noted that although the government did not "share the Community's interest in protecting [the Community's] sovereignty," there was no explanation of "how the Community's sovereignty would be implicated" in the suit. *Id.* at 1154–55.

In *Alto v. Black*, we likewise held that the United States could represent a tribe's interest in a suit challenging a BIA order upholding the tribe's decision to disenroll certain individuals as members of the tribe. 738 F.3d at 1128. As

we explained, the tribe's own governing documents vested BIA with ultimate authority over the tribe's membership decisions. *Id.* at 1115. We also relied on the government's shared interest in defending its own decision, which it had already "vigorously defended," and its obligation to protect tribal interests as part of its general "trust responsibility" to tribes. *Id*. at 1128 (citation omitted). The tribe had not "presented any arguments that it would offer . . . which [the government] ha[d] not or would not make." *Id.*

The Tenth Circuit in *Manygoats v. Kleppe*, 558 F.2d 556 (10th Cir. 1977), held, in contrast, that the government could not adequately represent a tribe's interests. In *Manygoats*, the Navajo had granted Exxon Corporation the right to mine uranium on tribal lands, and the Secretary of the Interior approved the agreement after completing an EIS. *Id.* at 557. Individual Navajo tribal members sought to enjoin performance of the mining agreement between the tribe and Exxon, claiming that the EIS was inadequate under NEPA. *Id.* The Tenth Circuit held that the Secretary of the Interior could not adequately represent the absent tribe because "[t]he Secretary must act in accord with the obligations imposed by NEPA," and the environmental goals of that statute were "not necessarily coincidental with the interest of the Tribe in the benefits which the Exxon agreement provides." *Id.* at 558.

Applying the lessons from these cases, we agree with the district court that Federal Defendants cannot be counted on to adequately represent NTEC's interests. Although Federal Defendants have an interest in defending their decisions, their overriding interest, as it was in *Manygoats*, must be in complying with environmental laws such as NEPA and the ESA. This interest differs in a meaningful sense from NTEC's and the Navajo Nation's sovereign interest in

ensuring that the Mine and Power Plant continue to operate and provide profits to the Navajo Nation. If the district court were to hold that NEPA or the ESA required more analysis that would delay mining activities, or that one of the federal agencies' analyses underlying the approval was flawed, Federal Defendants' interest might diverge from that of NTEC. As we suggested in *White*, a holding that one or both of these statutes required something other than what Federal Defendants have interpreted them to require could similarly change Federal Defendants' planned actions, affecting the lease, rights-of-way, and permits at stake.

This case is unlike *Southwest*, because while Federal Defendants have an interest in defending their own analyses that formed the basis of the approvals at issue, here they do not share an interest in the *outcome* of the approvals—the continued operation of the Mine and Power Plant. And no party in *Southwest* had explained how the tribe's "sovereignty would be implicated," 150 F.3d at 1154, as the Navajo Nation has explained here. This case is also distinguishable from *Alto*, where the tribe had specifically granted BIA final decisionmaking authority over tribal membership issues, making it more plausible that the government would represent the tribe's interest—or that the government's interest and the tribe's interest had become one and the same.

Plaintiffs resist the conclusion that no existing party can adequately represent NTEC's interest, arguing that APS, as operator and part owner of the Power Plant, can do so even if Federal Defendants cannot. In *Southwest*, we noted that the presence of other cities that were financially invested in, and dependent for their water supply upon, the facility lessened the risk that the Community's interest would be impaired. Here, APS shares at least some of NTEC's and

the Navajo Nation's financial interest in the outcome of the case. But APS does not share the Navajo Nation's *sovereign* interest in controlling its own resources, and in the continued operation of the Mine and Power Plant and the financial support that such operation provides. The Navajo Nation's interest is tied to its very ability to govern itself, sustain itself financially, and make decisions about its own natural resources. Because no other party to the litigation can adequately represent these interests, the district court did not err in determining that NTEC is a party that must be joined if feasible under Rule 19(a).

## B.

Rule 19 requires us next to ask whether NTEC can feasibly be joined as a party to this litigation. Reviewing de novo, *see Peabody W. Coal Co.*, 400 F.3d at 778, we hold that, due to tribal sovereign immunity, it cannot be.

"Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe. This immunity applies to the tribe's commercial as well as governmental activities." *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008) (citation omitted). "[T]he settled law of our circuit is that tribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a tribe itself." *Id.*

Here, it is undisputed that Congress has not abrogated any relevant aspect of the Navajo Nation's tribal immunity, and that the Navajo Nation has not waived its immunity. The question is thus whether NTEC shares that immunity.

In *Allen v. Gold Country Casino*, 464 F.3d 1044 (9th Cir. 2006), we had "little doubt that [a] Casino function[ed] as an arm of the Tribe" that owned and operated it, and that the

casino therefore "enjoy[ed] the Tribe's immunity from suit." *Id.* at 1047.  In that case, the casino had been authorized by tribal ordinance and an interstate gaming compact; the casino served to promote the tribe's self-sufficiency, economic development, and employment opportunities; and the economic advantages of the casino inured to the benefit of the tribe such that "[i]mmunity of the Casino directly protect[ed] the sovereign Tribe's treasury." *Id.* at 1046–47; *see also Cook*, 548 F.3d at 726 (holding that a corporation created by a tribe through tribal ordinance and intergovernmental agreement that was wholly owned and managed by the tribe, and from which the benefits flowed to the tribe, enjoyed the tribe's sovereign immunity).

Here, NTEC is wholly owned by the Navajo Nation and is organized pursuant to Navajo law.  It was created specifically so that the Navajo Nation could purchase the Mine.  NTEC's profits go entirely to the Navajo Nation, and those profits support the Navajo Nation's ability to govern and financially sustain itself.  The district court was therefore correct that NTEC is an "arm" of the Navajo Nation that enjoys the Nation's immunity from suit and cannot be joined to this action.[7]

---

[7] Plaintiffs argue that the court could order joinder of NTEC's chief executive officer pursuant to the *Ex parte Young* doctrine.  That doctrine "permits actions for prospective non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law, without the presence of the immune State or tribe." *Salt River Project Agric. Improvement & Power Dist. v. Lee*, 672 F.3d 1176, 1181 (9th Cir. 2012) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *see also Vann v. U.S. Dep't of Interior*, 701 F.3d 927 (D.C. Cir. 2012).  But both *Salt River* and *Vann*, on which Plaintiffs rely in making this argument, involved claims against tribes as defendants, so it was possible for a tribal official, rather than the tribe itself, to be named as defendant

## C.

Because NTEC is a required party that cannot feasibly be joined, we must next determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

## 1.

To evaluate whether an action could fairly proceed without a required party, we consider the following factors:

> (1) the extent to which a judgment rendered in the [party's] absence might prejudice that [party] or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the [party's] absence would be adequate; and

---

pursuant to *Ex parte Young*. Plaintiffs' claims here are that *Federal Defendants* violated environmental laws—not that the Navajo Nation itself did. The *Ex parte Young* doctrine therefore has no role to play here.

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).    The Rule 19(b) factors "are nonexclusive."    *Republic of Philippines v. Pimentel*, 553 U.S. 851, 862 (2008).

In general, "[i]f no alternative forum exists, [a court] should be 'extra cautious' before dismissing an action." *Kescoli*, 101 F.3d at 1311 (quoting *Makah*, 910 F.2d at 560). But "[i]f the necessary party is immune from suit, there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'" *Id.* (quoting *Confederated Tribes v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991)); *see also Am. Greyhound Racing, Inc.*, 305 F.3d at 1025 ("[S]ome courts have held that sovereign immunity forecloses in favor of tribes the entire balancing process under Rule 19(b), but we have continued to follow the four-factor process even with immune tribes."). Indeed, we have observed that there is a "wall of circuit authority" in favor of dismissing actions in which a necessary party cannot be joined due to tribal sovereign immunity— "virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy is available, if the absent parties are Indian tribes invested with sovereign immunity." *White*, 765 F.3d at 1028.

## 2.

Applying the Rule 19(b) factors, we hold that the district court did not err in concluding that the litigation could not, in good conscience, continue in NTEC's absence.

Prejudice, the first factor in the Rule 19(b) analysis, "largely duplicates the consideration that made a party necessary under Rule 19(a)," *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025, and clearly favors dismissal in this case. The Navajo Nation and NTEC would be prejudiced if this lawsuit were to proceed and Plaintiffs were to prevail—at stake is an estimated 40 to 60 million dollars per year in revenue for the Navajo Nation, as well as its ability to use its natural resources how it chooses.

The second factor, the court's ability to shape relief so as to avoid prejudice, likewise favors dismissal. Although relief could be shaped to avoid prejudice in the short term, such as by remanding for further administrative review without vacating the permits and approval decisions in the meantime, the Navajo Nation inevitably would be prejudiced if Plaintiffs ultimately succeeded and if, after further NEPA and ESA processes, Federal Defendants were not able to come to the same decisions without imposing new restrictions or requirements on the Mine or Power Plant.

The third factor, on the other hand, weighs against dismissal. A judgment rendered in NTEC's absence would be adequate and would not create conflicting obligations, because it is Federal Defendants' duty, not NTEC's, to comply with NEPA and the ESA.

The fourth factor depends on whether Plaintiffs would have an alternate remedy if this suit is dismissed. Were this suit dismissed, Plaintiffs would have no alternate forum in which to sue Federal Defendants for their alleged procedural violations under NEPA and the ESA. NTEC argues, however, that Plaintiffs may be able to "raise environmental claims in Navajo courts" under Navajo law.

We need not decide whether any alternate remedy is available in the Navajo Nation courts for the environmental concerns motivating Plaintiffs' challenge to the mining operations at issue here. Even assuming that no alternate remedy exists, and that both the third and fourth factors therefore weigh against dismissal, we would hold that dismissal is proper. We have recognized that the lack of an alternative remedy "is a common consequence of sovereign immunity." *Id.* Accordingly, "we have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs." *Id.* Mindful of the "wall of circuit authority" in favor of dismissing an action where a tribe is a necessary party, *White*, 765 F.3d at 1028, we agree with the district court that this litigation cannot, in good conscience, continue in NTEC's absence.

### 3.

Finally, Plaintiffs and the United States urge us to apply the "public rights" exception to hold that this litigation can continue in NTEC's absence.[8] The public rights exception is a limited "exception to traditional joinder rules" under which a party, although necessary, will not be deemed "indispensable," and the litigation may continue in the absence of that party. *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988). We hold that the exception does not apply here.

The public rights exception is reserved for litigation that "transcend[s] the private interests of the litigants and seek[s]

---

[8] Federal Defendants did not file an answering brief; instead the United States filed a brief as amicus curiae arguing that "federal agencies and officers are normally the only necessary defendants in" federal suits challenging agency action. Answering briefs defending the grounds of the district court's dismissal were filed by only NTEC and APS.

to vindicate a public right." *Kescoli*, 101 F.3d at 1311. The public rights exception may apply in a case that could "adversely *affect* the absent parties' interests," but "the litigation must not '*destroy* the legal entitlements of the absent parties'" for the exception to apply. *Id.* (emphasis added) (quoting *Conner*, 848 F.2d at 1459).

The doctrine derives from the Supreme Court's decision in *National Licorice Co. v. N.L.R.B.*, 309 U.S. 350 (1940), in which the Court allowed a suit to proceed in the absence of necessary parties because it involved enforcement of public rights. In *National Licorice*, a company was the subject of a National Labor Relations Board ("NLRB") action challenging as violative of federal labor laws contracts the company had procured from its employees. *Id.* at 351–56. The defendant company argued that those absent employees were necessary and indispensable parties to the NLRB action. *Id.* at 356. The Court held that the employees did not need to be joined because the case was "narrowly restricted to the protection and enforcement of public rights"—specifically, the public's interest in "the prevention of unfair labor practices." *Id.* at 363–64. Analogizing to actions brought by the government under the Sherman Antitrust Act or orders entered by the Federal Trade Commission, *id.* at 365–66, the Court held that "the public right was vindicated by restraining the unlawful actions of the defendant." *Id.* at 366. It also reasoned that the absent employees' legal entitlements would not be destroyed because the employees "were left free to assert such legal rights as they might have acquired under their contracts." *Id.*

We applied the public rights exception to allow suit to proceed in *Conner v. Burford*, where the plaintiffs sued BLM alleging that its sale of oil and gas leases in two national forests violated NEPA and the ESA. 848 F.2d at

1442–43.  BLM had sold two different types of leases: for one type, lessees were prohibited "from occupying or using the surface of the leased land without further specific approval from . . . BLM"; for the other, the government was authorized to impose conditions on surface-disturbing activities, but not to altogether preclude such activities.  *Id.* at 1444.  During the ESA consultation process, Fish and Wildlife and the U.S. Forest Service decided to analyze the environmental effects of the lease sales only, and not those of post-leasing activities.  *Id.* at 1444.  The district court entered judgment in the plaintiffs' favor, reasoning that NEPA required a comprehensive EIS that evaluated not only the sale of a lease but also "the cumulative effects of successive, interdependent steps culminating in oil and gas development and production."  *Id.*  Several lessees attempted to intervene, arguing that they were necessary and indispensable parties.  *Id.* at 1445.

Clarifying the district court's order, we "enjoin[ed] the federal defendants from permitting any surface-disturbing activity to occur on any of the leases [of either type] until they ha[d] fully complied with NEPA and [the] ESA."  *Id.* at 1461.  We recognized that the contracts themselves, however, "were not invalidated and further actions construing rights under them [were] not precluded."  *Id.* at 1460–61.  We thus held that the only thing foreclosed by the district court's judgment was the "lessees' ability to get 'specific performance' [on their contracts] until the government complie[d] with NEPA and the ESA," which was "insufficient to make the lessees indispensable to [the] litigation."  *Id.* at 1461.  The leaseholders still retained "many of the fundamental attributes of their contracts," given that "significant economic value inheres in the exclusive right to engage in oil and gas activities, should any be allowed."  *Id.*  Because "[t]he appellees' litigation against

the government [did] not purport to adjudicate the rights of current lessees," but rather to "enforce the public right to administrative compliance with the environmental protection standards of NEPA and the ESA," the public rights exception applied. *Id.* at 1460.

In *Kescoli*, by contrast, we declined to apply the public rights exception and thus affirmed dismissal of the suit. 101 F.3d at 1312. We reasoned that "if the action proceeded in the absence of the Navajo Nation and the Hopi Tribe, the rights of their members under the lease agreements could be significantly affected." *Id.* at 1311–12. "The litigation also threaten[ed] the Navajo Nation's and the Hopi Tribe's sovereignty by attempting to disrupt their ability to govern themselves and to determine what is in their best interests [by] balancing potential harm caused by the mining operations against the benefits of the royalty payments." *Id.* at 1312. The litigation therefore was "not limited to ensuring an agency's future compliance with statutory procedures," and was "not one in which the risk of prejudice to the Navajo Nation and the Hopi Tribe [was] nonexistent or minimal." *Id.*

This case is more like *Kescoli* than *Conner*. Here, the leases and rights-of-way are valid only with approval by BIA. If the Record of Decision that granted such approval were vacated, then those agreements would be invalid, and NTEC would lose all associated legal rights. And, unlike in *Conner* where surface-disturbing activity had apparently not even been authorized or begun, the activities approved by the Record of Decision here are already taking place. This litigation therefore threatens to destroy NTEC's existing legal entitlements. *See Am. Greyhound Racing, Inc.*, 305 F.3d at 1026 (rejecting application of the public rights exception, reasoning that the "litigation targeted the

extension or renegotiation of the compacts themselves," and did "not *incidentally* affect the gaming tribes in the course of enforcing some public right," but rather was "*aimed* at the tribes and their gaming"); *Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087 (9th Cir. 1998) (distinguishing *Conner* and holding that where title to land transferred in a challenged transaction had already vested in private parties, an order declaring the land exchange void would destroy the parties' legal entitlements, rendering the public rights exception inapplicable).

We acknowledge that Plaintiffs' claims relate to public rights insofar as they challenge only Federal Defendants' NEPA and ESA processes. We also recognize that the practical effect of this litigation on NTEC's rights would depend on what, exactly, the outcome of the litigation would be if it proceeded. It is possible that, if the lawsuit continued, the district court might grant judgment in favor of Federal Defendants, or it might grant limited relief for Plaintiffs that would not substantially impact NTEC's rights.

We believe, however, that the question at this stage must be whether the litigation *threatens* to destroy an absent party's legal entitlements. *See Kescoli*, 101 F.3d at 1311–12 (holding that the public rights exception was inapplicable in part because "if the action proceeded in the absence of [two tribes], the rights of their members under the lease agreements *could* be significantly affected" (emphasis added)); *Shermoen v. United States*, 982 F.2d 1312, 1319 (9th Cir. 1992) ("Because of the threat to the absent tribes' legal entitlements, and indeed to their sovereignty, posed by the present litigation, application of the public rights exception . . . would be inappropriate."). Here, although Plaintiffs nominally seek only a renewed NEPA and ESA process, the implication of their claims is that Federal

Defendants should not have approved the mining activities in their exact form.  The result Plaintiffs seek, therefore, certainly threatens NTEC's legal entitlements.

We also recognize, as the Tenth Circuit has pointed out, that refusing to apply the public rights exception arguably "produce[s] an anomalous result" in that "[n]o one, except [a] Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on [that tribe's] lands." *Manygoats*, 558 F.2d at 559.  Or, at least, no one could obtain such review unless the tribe were willing to waive its immunity and participate in the lawsuit. This result, however, is for Congress to address, should it see fit, as only Congress may abrogate tribal sovereign immunity.  *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014).  It is undisputed that Congress has not done so here.

The public rights exception therefore does not apply.

### III.

For the foregoing reasons, we **AFFIRM**.